AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

<table>
<tr><td>
United States of America

v.

TERUPE TEHAHE, and
LENA CADOUSTEAU,

Defendants.
</td><td>
FILED
CLERK, U.S. DISTRICT COURT

2/11/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: ___jb___ DEPUTY

Case No.   2:24-mj-00778-DUTY
</td></tr>
</table>

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of February 10, 2024, in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1): | Possession with Intent to Distribute Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/
*Complainant's signature*

Stefan Cvijanovic, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:        2/11/2024

City and state:   Los Angeles, California

_____
*Judge's signature*

Hon. Pedro V. Castillo, U.S. Magistrate Judge
*Printed name and title*

AUSA: Colin S. Scott x3159

## AFFIDAVIT

I, Stefan Cvijanovic, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against Terupe TEHAHE ("TEHAHE") and Lena CADOUSTEAU ("CADOUSTEAU"), for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute Methamphetamine.

2.   This affidavit is also made in support of an application for a warrant to search the following digital devices (the "SUBJECT DEVICES"), seized during the arrest of TEHAHE and CADOUSTEAU on February 10, 2024, and held in the custody of Homeland Security Investigations ("HSI"), in El Segundo, California, as described more fully in Attachment A:

      a.   One white Samsung, IMEI: 353100/56/436909/9, seized from TEHAHE's person ("SUBJECT DEVICE 1"); and

      b.   One green Samsung, IMEI: 352229/11/237128/0, seized from CADOUSTEAU's person ("SUBJECT DEVICE 2").

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and 846 (Conspiracy and Attempt to Distribute Controlled Substances) (the "Subject Offenses"), as

described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. __BACKGROUND OF AFFIANT__

5.    I am a Special Agent with HSI, currently assigned to the Office of the Assistant Special Agent in Charge Los Angeles International Airport ("LAX").

6.    In 2022, I completed the Criminal Investigator Training Program, and in 2023 I completed the Homeland Security Investigations Special Agent Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. During these programs, I received training in HSI's criminal investigative and arrest authority, as well as investigative techniques for conducting criminal investigations, including special training in investigations regarding narcotics.

7.    I was previously employed as a United States Customs and Border Protection ("CBP") Officer since 2013. I have

completed Basic Inspector (Customs and Border Protection academy) training at the Federal Law Enforcement Training Center in Brunswick, Georgia.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.   On February 9, 2024, TEHAHE and CADOUSTEAU attempted to travel from LAX to Tahiti International Airport via Air Tahiti on flight TN 111, which was scheduled to depart at approximately 10:50 p.m.

10.   During security screening, Transportation Security Administration ("TSA") officers identified anomalies in TEHAHE's bag on the x-ray images. TSA then searched his bag and found pants containing crystalline substances that later field tested positive for methamphetamine. Law enforcement later searched his bag and discovered another pair of pants containing crystalline substances that later field tested positive for methamphetamine. During a recorded and Mirandized interview, TEHAHE told law enforcement that the bag in which the methamphetamine was discovered was his and that he packed the bag himself. The crystalline substances discovered inside the two pairs of pants weighed a total of approximately 2.258 kilograms.

11.   CBP Officers conducted a secondary inspection of CADOUSTEAU after she arrived at the boarding gate due to the quick turnaround nature of her trip and the recent influx of outbound narcotics destined from LAX to Tahiti. During the CBP inspection of CADOUSTEAU, CBP Officers discovered a total of approximately 2.16 kilograms of methamphetamine concealed within

CADOUSTEAU's jacket and on her person. During a recorded and Mirandized interview, CADOUSTEAU admitted that she was going to take something back to Tahiti which she suspected was illegal, and that she was going to be paid approximately $45,000 for doing so.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

12. Based on my involvement in this investigation, my conversations with other law enforcement officials involved in this investigation, and my review of reports and records connected to this investigation, I know the following facts:

### A. **TEHAHE Attempts to Smuggle Methamphetamine Through TSA Screening Inside of his Carry-On Bag**

13. I know from reviewing law enforcement reports that at approximately 8:35 p.m. on February 9, 2024, TSA Transportation Security Officer ("TSO") Jean Pierre was working the x-ray machine at the LAX Tom Bradley International Terminal security screening checkpoint when TEHAHE placed his carry-on roller bag on the x-ray machine conveyor belt. TEHAHE is a resident of French Polynesia, and according to booking records was scheduled to depart on Air Tahiti flight TN 101 to Tahiti International Airport at 10:55 p.m.

14. TSO Pierre reviewed the x-ray images of TEHAHE'S bag and saw what appeared to be a large inorganic mass inside the carry-on roller bag. TSO Pierre referred TEHAHE'S carry-on roller bag for secondary screening.

15. I talked with Lead TSO Oida Sakura who informed me that she noticed that something was concealed inside the jeans.

During the exam of the jeans that were inside the TEHAHE'S
carry-on roller bag, Lead TSO Sakura discovered crystalline
substances, pictured below, and immediately notified her
supervisor, TSO Rudy Poncevelazquez.



16.    TSO Poncevelazquez then contacted the airport
coordination center to request a bomb technician.

17.    I talked with TSA bomb technician Dannals Buckhannan
who informed me he arrived and examined the crystalline
substances inside the jeans. Buckhannan tested the crystalline
substances with a chemical analysis device, which was a negative
hit for any explosives but tested positive for methamphetamine.

18.    Based on my knowledge of the investigation, I know
that at approximately 9:28 p.m. CBP informed HSI that TEHAHE was
stopped at the TSA checkpoint with narcotics. At approximately
9:50 p.m., HSI took TEHAHE into custody. At that time TEHAHE was
in possession of SUBJECT DEVICE 1. TEHAHE was transported to the
main CBP secondary inspection area at the Tom Bradley

International Terminal by HSI and Los Angeles Airport Police Department ("LAXPD").

19.   CBPOs notified HSI and reported that the white crystalline substances that was discovered inside TEHAHE'S carry-on luggage tested positive for the presence of methamphetamine using a Gemini Narcotics Analyzer. The total approximate weight of the methamphetamine that TEHAHE was in possession was approximately 2.258 kilograms. Based on my training and experience, the quantity of methamphetamine is consistent with distribution, not mere personal use.

**B.   CADOUSTEAU Attempts to Smuggle Methamphetamine on Board a Flight to Tahiti**

20.   I was informed by CBPO Ventrice, that on February 9, 2024, CBPOs encountered CADOUSTEAU while she attempted to depart the United States at Gate 206 in the Tom Bradley International Terminal for Tahiti. CBP had previously decided to target CADOUSTEAU for inspection based upon her suspicious travel pattern. CADOUSTEAU's travel pattern was identified as suspicious because her ticket had been paid for by a check and she booked her return flight within three days of having first arrived in the United States. Based on my training and experience, I know that this pattern is indicative of drug trafficking.

21.   During the inspection of CADOUSTEAU, CBPOS discovered a sock which was stuffed with crystalline substances inside of CADOUSTEAU's jacket. After this discovery, CBPO Ventrice

performed a pat down of CADOUSTEAU and felt an object strapped around CADOUSTEAU'S waist which is pictured below.




22.    I know from talking with other law enforcement agents that following the discovery of suspected methamphetamine, CBPOs continued to search CADOUSTEAU's luggage and discovered SUBJECT DEVICE 2 but did not discover any other contraband. CADOUSTEAU was transported to the main inspection area at the Tom Bradley International Airport for further processing.

23.    Based on my knowledge of the investigation, I know that during that inspection, law enforcement removed a package that was strapped to CADOUSTEAU's groin area. The contents of the package and the sock subsequently tested positive for the presence of methamphetamine using a Gemini Narcotics Analyzer,

which I understand to be a tool law enforcement uses to field-
test suspected drugs.

24.   Based on my knowledge of the investigation, I know
that at approximately 10:20 p.m., CBPOs notified HSI that the
white crystalline substances that was strapped to CADOUSTEAU's
body and was also discovered inside her jacket had tested
positive for the presence of methamphetamine using a Gemini
Narcotics Analyzer. The total approximate weight of the
methamphetamine that CADOUSTEAU had on her body and inside the
sock was approximately 2.16 kilograms. Based on my training and
experience, the quantity of methamphetamine is consistent with
distribution, not mere personal use.

   **B. Interviews of TEHAHE and CADOUSTEAU**

25.   HSI Special Agent Michael Choi and I, with the
assistance of a French interpreter, interviewed TEHAHE. The
following is a summary of the interview and does not purport to
set forth all facts or knowledge involved in the interview.

26.   At approximately 11:14 p.m., TEHAHE was presented a
Miranda Rights Waiver form which was translated into French by
the interpreter. TEHAHE waived his rights and began to speak
with HSI regarding the methamphetamine located in his carry-on
luggage.

27.   TEHAHE told law enforcement that he was in Los Angeles
to do some shopping. TEHAHE stated that all the bags he
presented to the TSA inspection were his. TEHAHE acknowledged
that he packed the carry-on roller bag in which methamphetamine

was discovered. TEHANE denied knowing that the drugs were in his carry-on roller bag. TEHANE denied knowing CADOUSTEAU.

28.  HSI Special Agent Michael Choi and I, with the assistance of a French interpreter, interviewed CADOUSTEAU. The following is a summary of the interview and does not purport to set forth all facts or knowledge involved in the interview.

29.  CADOUSTEAU was presented a Miranda Rights Waiver form which was translated into French by the interpreter. CADOUSTEAU waived her rights and began to speak with HSI regarding the methamphetamine located on her person.

30.  CADOUSTEAU told law enforcement that she and TEHANE stayed at the same hotel. CADOSTEAU stated she was given something to carry back to Tahiti. CADOUSTEAU stated she did not know what she was supposed to carry back to Tahiti but suspected that it was something that is illegal.

31.  CADOUSTEAU said that she had been promised between 5,000,000 to 10,000,000 French Polynesian Franks to bring the package back to Tahiti. According to my review of Xe.com, a currency converter website, 5,000,000 French Polynesian Franks is the equivalent of approximately $45,182 U.S. currency.  Based on my training and experience, this figure is consistent with the figure paid to other couriers from the United States to Tahiti which HSI has intercepted.

32.  Based on my knowledge of the investigation, HSI took custody of the methamphetamine, luggage, and SUBJECT DEVICES. HSI then verified the field-test conducted by CBP of the

crystalline substances that were in TEHAHE's luggage and in CADOUSTEAU's possession using the ThermoFisher Gemini, which I understand to be a tool law enforcement uses to field-test suspected drugs. The test indicated that the substance was positive for methamphetamine. The total weight of methamphetamine that was found in TEHAHE'S luggage was approximately 2.258 kilograms. The total weight of the sock and the package that was wrapped around CADOUSTEAU'S groin area was approximately 2.16 kilograms.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

33.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained

where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## I.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

34.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

35.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

36. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

e.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

f.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

37.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

38. For all the reasons described above, there is probable cause to believe that TEHAHE and CADOUSTEAU have committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.  There is also probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 11th day of
February, 2024.

_____
HONORABLE PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE

## <u>ATTACHMENT A</u>

<u>PROPERTY TO BE SEARCHED</u>

1.    The following digital devices (the "SUBJECT DEVICES"), seized during the arrest of TEHAHE and CADOUSTEAU on or about February 10, 2024, and held in the custody of Homeland Security Investigations ("HSI"), in El Segundo California:

a. One white Samsung, IMEI: 353100/56/436909/9, seized from TEHAHE's person ("SUBJECT DEVICE 1"); and



b. One green Samsung, IMEI: 352229/11/237128/0, seized from CADOUSTEAU's person ("SUBJECT DEVICE 2").



**ATTACHMENT B**

**I. ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and 846 (Conspiracy and Attempt to Distribute Controlled Substances), (the "Subject Offenses"), from January 1, 2023, to February 10, 2024, namely:

        a.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

        b.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

        c.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

d.    Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

e.    Audio recordings, pictures, video recordings, or still captured images relating to the possession or distribution drugs and the collection or transfer of the proceeds of the above-described offenses;

f.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

2.    Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

3.    With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

a.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses,

Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      c.   evidence of the attachment of other devices;

      d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

      e.   evidence of the times the device was used;

      f.   passwords, encryption keys, and other access devices that may be necessary to access the device;

      g.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

      h.   records of or information about Internet Protocol addresses used by the device; and

      i.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    4.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II. SEARCH PROCEDURE FOR THE SUBJECT DEVICE

5.    In searching the SUBJECT DEVICES or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device(s) and/or forensic images thereof beyond this 120-day period without obtaining an extension of time order from the Court.

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the

scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.   If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data

falling within the list of other items to be seized, the
government may retain the digital device and any forensic copies
of the digital device, but may not access data falling outside
the scope of the other items to be seized (after the time for
searching the device has expired) absent further court order.

       i.   The government may also retain a SUBJECT DEVICE
if the government, prior to the end of the search period, obtains
an order from the Court authorizing retention of the device (or
while an application for such an order is pending), including in
circumstances where the government has not been able to fully
search a device because the device or files contained therein
is/are encrypted.

       j.   After the completion of the search of the SUBJECT
DEVICES, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

      6.   The review of the electronic data obtained pursuant to
this warrant may be conducted by any government personnel
assisting in the investigation, who may include, in addition to
law enforcement officers and agents, attorneys for the
government, attorney support staff, and technical experts.
Pursuant to this warrant, the investigating agency may deliver a
complete copy of the seized or copied electronic data to the
custody and control of attorneys for the government and their
support staff for their independent review.

      7.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices

pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

FINDING RE PROBABLE CAUSE

On ___2/11/24___, at ___10:52 am___., Agent Stefan Cvijanovic of Homeland Security Investigations appeared telephonically regarding the probable cause arrest of defendant TERUPE TEHAHE, occurring on or about February 10, 2024, at Los Angeles, California.

Having reviewed the Criminal Complaint and supporting affidavit filed concurrently herewith, the Court finds that there **exists** probable cause to arrest the defendant for a violation of Title 21, United States Code, Section 841(a)(1).

/____/ It is ordered that defendant TERUPE TEHAHE be held to answer for proceedings under Federal Rule of Criminal Procedure 5 / 40 on _____.

/____/ It is ordered that defendant TERUPE TEHAHE be discharged from custody on this charge forthwith.

DATED: __2/11/24_____, at __10:52_____ a.m

_____
HON. PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE

<u>FINDING RE PROBABLE CAUSE</u>

On __2/11/24_____, at __10:52_____am, Agent Stefan Cvijanovic of
Homeland Security Investigations appeared before me regarding the
probable cause arrest of defendant LENA CADOUSTEAU, occurring on or about
February 10, 2024, at Los Angeles, California.
Having reviewed the Criminal Complaint and supporting affidavit filed
concurrently herewith, the Court finds that there **exists** probable cause
to arrest the defendant for a violation of Title 21, United States Code,
Section 841(a)(1).


/____/ It is ordered that defendant LENA CADOUSTEAU be held to answer for
proceedings under Federal Rule of Criminal Procedure 5 / 40 on
_____.


/____/ It is ordered that defendant LENA CADOUSTEAU be discharged from
custody on this charge forthwith.


DATED: __2/11/24_____, at _10:52_____ a.m.


_____
HON. PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE